J-S21028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | No. 151 EDA 2024 |

Appeal from the Order Entered December 12, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000905-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | No. 152 EDA 2024 |

Appeal from the Decree Entered December 12, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000290-2023

BEFORE: LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY NICHOLS, J.: **FILED OCTOBER 22, 2024**

D.H. (Father) appeals from the decree terminating his parental rights to S.H. (Child), born in September of 2021, and the order changing Child's permanency goal to adoption.[1] This Court previously ordered Father's

---

[1] Mother's parental rights to Child were terminated on the same date. Mother filed separate appeals from the goal change order and the termination decree, which we addressed in a separate memorandum.

counsel, James W. Martin, Esq. (Counsel) to file a new application to withdraw from representation and an amended ***Anders***/***Santiago***[2] brief.  Counsel has complied.  After review, we grant Counsel's application to withdraw and affirm.

Briefly, on September 5, 2021, the Philadelphia Department of Human Services (DHS) received a General Protective Services (GPS) report indicating that Mother had recently given birth to Child and alleging that Mother had a history of untreated mental illness, smoked marijuana while pregnant with Child, and missed prenatal checkup appointments.  As part of its investigation, DHS caseworkers determined that Father and Mother were living in a garage without working utilities.  DHS filed an application for an order of protective custody (OPC) for Child on September 9, 2021.  That same day, the trial court appointed Karen Deanna Williams, Esq., to act as Child's guardian *ad litem* (GAL) and legal counsel.  ***See*** Order Appointing Counsel, CP-51-DP-905-2021, 9/9/21.

The trial court adjudicated Child dependent on September 29, 2021. DHS placed Child in a pre-adoptive kinship foster home, where she has remained throughout the underlying dependency matter.  DHS filed a petition to involuntarily terminate Father's parental rights on August 2, 2023.  The trial court conducted a hearing on December 12, 2023.

_____

[2] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending ***Anders*** to appeals involving the termination of parental rights).

At the hearing, DHS presented testimony from Edward McNichol, a Community Umbrella Agency (CUA) case manager. Father testified on his own behalf.

Father testified that during this dependency case he and Mother moved from Philadelphia to York, Pennsylvania in March of 2022. *See* N.T., 12/12/23, at 15, 25. Father explained that they moved to York because all of their rental applications in Philadelphia had been denied due to Father's bad credit history and prior criminal record. *Id.* at 22-24. Father and Mother rented the residence in York from a friend of Father's. *Id.* at 23. During that time, CUA caseworkers had conducted approximately four visits to their home. *Id.* at 16. Father asserted that he had resolved all of CUA's concerns about the condition of the home by the fourth visit. *Id.* at 17-18. Father had been living in York for about fifteen months before he was arrested and incarcerated in May of 2023. *Id.* at 15, 22, 25. Father explained that, as of the date of the termination of parental rights hearing, he had been charged with murder and was awaiting trial. *Id.* at 11-12.

Father had been self-employed as a general contractor and provided bank statements to CUA as proof of his work history. *Id.* at 14-15.

Father estimated that prior to his incarceration, he had at least one hundred hours of visitation with Child across at least forty visits. *Id.* at 18-19. Some of Father's visits with Child were supervised by Child's foster mother's (Foster Mother), others were supervised by CUA, and the remainder were unsupervised. *Id.* Father described Child's demeanor with him during

his visits as playful and affectionate. *Id.* at 19. Father stated that he requested additional visitation time with Child, but that was not granted because of scheduling issues. *Id.* at 21. Father has not had any contact with Child since his arrest in May of 2023. *Id.* at 13. Father testified that he tried to contact Foster Mother while incarcerated, but she did not respond to his calls or emails. *Id.*

Mr. McNichol testified that he had been the case manager for the parents' family for about four-and-a-half years, which predated Child being taken into the care of DHS. *Id.* at 27-28. At the time of Child's birth, Father and Mother did not have appropriate housing, and there were "illegal substances in [C]hild's system when she was born." *Id.* at 29. At the time of Child's birth, Father and Mother were living in a garage attached to a house in the "Manayunk/Roxborough" section of Philadelphia. *Id.* The garage was not appropriate housing for an infant because it lacked working utilities. *Id.* at 29-31, 47.

Mr. McNichol testified that Father's single case plan objectives were housing, employment, visitation with Child, and attending basic and wellness visits for Child based on her age. *Id.* at 33.

After Father and Mother moved to York, Pennsylvania, Mr. McNichol inspected their home and advised them that there were several hazardous conditions in the home that they had to address to make it safe for a baby, including removing clutter in the home such as power tools and piles of books, and pallets of scrap metal in the backyard. *Id.* at 40, 48, 51. The parents

also had four dogs in the home who had not been trained. *Id.* at 40, 48-49. Instead of water bowls, the parents kept buckets of water for the dogs to drink out of, which an infant could easily tip over. *Id.* at 40.

Subsequently, the owner of the house in York commenced eviction proceedings against Child's parents due to non-payment of rent. *Id.* at 52-53. Mother was evicted from that residence after Father was incarcerated. *Id.* Father has not told Mr. McNichol where he would reside if he were released from incarceration. *Id.* at 38-39.

Mr. McNichol testified that Father was previously employed fixing utility lines and highway lights throughout Pennsylvania, which kept Father away from home for weeks at a time. *Id.* at 49-50. Father provided proof of employment to Mr. McNichol. *Id.* at 59. Father eventually left that position. *Id.* at 50, 61. Afterwards, Father was self-employed collecting and selling scrap metal. *Id.* at 32, 50. Father provided documentation of income from his scrap metal business to Mr. McNichol. *Id.* at 41, 59-60.

Father had supervised visitation with Child once per week. *Id.* at 33. Sometimes visitation occurred at the DHS building and other times it occurred at Foster Mother's home. *Id.* During some of the visits at Foster Mother's home, Father had some time where he could take Child out into the community unsupervised. *Id.* at 34. While Father was traveling for work, he missed visitation with Child for several consecutive weeks. *Id.* at 60-61. Father's parenting of and interactions with Child during his supervised

- 5 -

visitation was age appropriate. *Id.* at 63-64. Father's last visit with Child was on March 31, 2023. *Id.* at 36, 64.

Mr. McNichol met with Father at the prison on October 11, 2023. *Id.* at 36. He asked Father if he had access to the means to communicate with Foster Mother and Child by video or phone. *Id.* Father stated that he did not have money in his prison commissary account to pay for phone calls. *Id.* at 37; *see also id.* at 68. However, Father's prison case manager informed Mr. McNichol that Father has access to a prison-issued tablet that he could use to make video calls to Foster Mother and Child. *Id.* at 37.

Mr. McNichol opined that Father's compliance with his single case plan objectives is minimal and that Father had made no progress towards alleviating the conditions that brought Child into care. *Id.* at 42-43. Mr. McNichol believed that Child could not be safely returned to Father's care if Father were released from incarceration because Father has not seen Child for close to a year. *Id.* at 43. Mr. McNichol opined that termination of Father's parental rights would not cause irreparable harm to Child and that there was no bond between Father and Child because Father had not visited Child regularly. *Id.* at 43-44, 62. He explained that Child looks to Foster Mother for safety and stability and that removing Child from Foster Mother's care would probably have an "extreme emotional impact" on Child, and that Foster Mother is willing to adopt Child. *Id.* at 45-46.

At the conclusion of the hearing, the trial court terminated Father's parental rights to Child pursuant to Section 2511(a)(1), (a)(2), (a)(5), (a)(8),

- 6 -

and (b) of the Adoption Act,[3] and changed Child's permanency goal to adoption.

Father timely appealed and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). In lieu of a Rule 1925(a) opinion, the trial court issued a notice of compliance with Rule 1925(a) in which it referred to sections from the notes of testimony where the court stated its reasons for terminating Father's parental rights on the record.[4] *See* Trial Ct. Rule 1925(a) Notice, 2/23/24, at 1-2 (unpaginated).

Counsel originally filed an application to withdraw and an *Anders*/*Santiago* brief. This Court denied Counsel's application to withdraw, finding that Counsel's letter to Father did not inform Father of his right to raise any additional arguments that Father deemed worthy of this Court's attention. *In re S.H.*, Nos. 151 EDA 2024, 152 EDA 2024, 2024 WL 3322591, at *3 (Pa.

---

[3] 23 Pa.C.S. §§ 2101-2938.

[4] We emphasize that our standards of review require deference to the trial court's findings of fact and credibility determinations and that, generally, this requires the filing of an opinion pursuant to Pa.R.A.P. 1925(a). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (noting that "there are clear reasons for applying an abuse of discretion standard of review in [dependency and termination of parental rights] cases" and acknowledging that "unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents" (citations omitted)); *see also In re S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) (emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court").

Super. filed July 8, 2024) (unpublished mem.). This Court denied Counsel's application to withdraw and directed Counsel to file a new application to withdraw along with an amended **Anders**/**Santiago** brief.

Counsel filed a new application to withdraw and a new **Anders**/**Santiago** brief. Father has not responded to Counsel's original or amended **Anders**/**Santiago** brief either *pro se* or through new counsel.

Counsel's **Anders**/**Santiago** brief identifies the following issues:

1. Whether the trial court committed reversible error, when it involuntarily terminated Father's parental rights, under 23 Pa. C.S.[] Sections 2511(a)(1), (2), (5) & (8) . . . .

2. Whether the trial court committed reversible error, when it involuntarily terminated Father's parental rights, and changed . . . Child's goal to adoption pursuant to 23 Pa. C.S.[] Section 2511(b), when DHS failed to prove by clear and convincing evidence that involuntarily terminating Father's parental rights best served the needs and welfare of . . . Child.

Am. **Anders**/**Santiago** Brief at 6 (some formatting altered).

**Child's Legal Counsel**

Initially, before we consider the issues Counsel identified in his amended **Anders**/**Santiago** brief, we must review *sua sponte* whether the trial court appointed legal counsel to represent Child for the termination proceedings pursuant to 23 Pa.C.S. § 2313(a). **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has interpreted Section 2313(a) "as requiring that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome." **Id.** (citation omitted and formatting altered). Additionally, the failure to appoint a

- 8 -

"separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis." ***Id.*** (citations omitted and formatting altered).

It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." ***Id.*** at 1236 (citation omitted). As such, our Supreme Court has held that **before** appointing an individual to serve as both guardian *ad litem* (GAL) and legal counsel for a child, the trial court "must determine whether counsel can represent the dual interests . . . ." ***Id.*** Further, where the trial court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." ***Id.*** at 1235.

However, our Supreme Court has also held that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously." ***In re T.S.***, 192 A.3d 1080, 1088 (Pa. 2018) (citations omitted).

The ***T.S.*** Court explained:

> The parties agree that, due to the children's very young age (two and three years old), they cannot have formed a subjective, articulable preference to be advanced by counsel during the termination proceedings, and this is entirely consistent with the record. It follows that the legal interests to be represented by Section 2313(a) counsel — which, again, are synonymous with the child's preference, were not ascertainable during the termination proceedings. . . .

\* \* \*

Such a circumstance does not negate the mandate of Section 2313(a) that counsel be appointed to "represent the child" in contested TPR proceedings. It does, however, bear on the question of whether a conflict arises if the trial court allows the attorney-GAL to fulfill that mandate. As a matter of sound logic, there can be no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment, and an attorney's concurrent obligation to advocate for the child's best interests as she understands them to be. Thus, we conclude that where an attorney-GAL is present in such proceedings undertaking the latter task (advocating for the child's best interests), Section 2313(a) does not require the appointment of another lawyer to fulfill the former (advancing the child's unknowable preference).

\* \* \*

[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed "to represent the child," 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.

**T.S.**, 192 A.3d at 1089-90, 1092-93 (footnotes and some citations omitted).

Here, the record reflects that the trial court appointed Attorney Williams as Child's GAL and legal counsel. **See** Order Appointing Counsel, DP-905-2021, 9/9/21. In the absence of a conflict between Child's best interests and legal interests, Attorney Williams could have acted in a dual capacity on Child's behalf. **See K.M.G.**, 240 A.3d at 1224, 1235-36. As noted previously, the record indicates that Child was two years and three months old at the time of the termination hearing, and that Child is capable of some speech because Child addresses Foster Mother as "mom." **See** N.T., 12/12/23, at 45. Father also testified that Child is playful and affectionate with Father, but does not

call Father anything. **See id.** at 20. However, there is no evidence in the record to indicate that Child at age two years and three months was capable of expressing any preference as to the outcome of the termination of parental rights proceedings. Therefore, we conclude that the although the trial court failed to make a determination on the record[5] that Child is too young for the GAL to have ascertained her preference as the outcome of the proceedings, the presumption from **T.S.** applies and Attorney Williams was able to serve both a Child's GAL and legal counsel. **See T.S.**, 192 A.3d at 1089-90, 1092-94. Therefore, we shall proceed to review Counsel's compliance with **Anders** and **Santiago**.

### Anders/Santiago

When faced with an **Anders**/**Santiago** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. **See In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

---

[5] In **K.M.G.**, we note that Justice Wecht filed a concurring and dissenting opinion, discussing the **T.S.** presumption. Justice Wecht suggested that in termination of parental rights matters where a child is too young to communicate, or otherwise incapable of forming and expressing, a preference as to the outcome, the child's counsel should "detail [their] efforts to glean the child's wishes, whether and to what extent those efforts succeeded, and that they confirmed no conflict, thus making a record that enables appellate review." **K.M.G.**, 240 A.3d at 1251-52 (Wecht, J., concurring and dissenting) (footnote omitted). Although not binding, Justice Wecht's assertion that counsel should detail their efforts to glean a young child's preference, thereby enabling the trial court to maintain a more complete record as to the **T.S.** presumption to facilitate appellate review, merits consideration.

To withdraw pursuant to **Anders**, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

> With respect to the third requirement of **Anders**, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

**In re J.D.H.**, 171 A.3d 903, 907 (Pa. Super. 2017) (citations and quotation marks omitted).

Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in **Santiago**:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**X.J.**, 105 A.3d at 3-4 (quoting **Santiago**, 978 A.2d at 361).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." **Id.** at 4 (citations omitted). Our independent review is not limited to the issue(s) discussed by counsel, but extends to "additional, non-frivolous

issues" that may have been overlooked by counsel. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it "lacks any basis in law or fact." *Santiago*, 978 A.2d at 356 (citation omitted).

Instantly, Counsel has filed an application for leave to withdraw that states that he conscientiously reviewed the record and determined that the appeal is frivolous. He has also provided this Court with a certificate of service demonstrating that he served Father with a copy of his amended *Anders*/*Santiago* brief, application for leave to withdraw, and a letter advising Father of his right to retain new counsel or proceed *pro se* or and the right to raise any additional points that Father deemed worthy of consideration. Additionally, Counsel's amended *Anders*/*Santiago* brief provides a summary of the essential facts and procedural history of the case. Counsel also sets forth his reasons for concluding that Father's appeal is frivolous. For these reasons, we conclude that Counsel has substantially complied with the technical requirements set forth above. Father did not file an appellate brief. Therefore, we proceed to an independent review of Counsel's assessment that the appeals are frivolous because there was sufficient evidence to terminate Father's parental rights. *See X.J.*, 105 A.3d at 4.

## Section 2511(a)(2)

Our standard of review in this context is well-settled:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super 2023) (citing *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)); *see also In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted)).

Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. §§ 2101-2938]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. [*T.S.M.*, 71 A.3d at 267].

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (some citations omitted and some formatting altered); *see also Q.R.D.*, 214 A.3d at 239 (explaining that if "the court determines the parent's conduct warrants termination of his or her parental rights, the court then engages in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child" (citation omitted and

formatting altered)). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied,

- 15 -

are "not limited to affirmative misconduct." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

> ***In re E.A.P.***, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted).

> Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [***A.L.D.***, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***Id.***

***In re Z.P.***, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Lastly, the courts of this Commonwealth have recognized that incarceration alone is not sufficient to support termination of parental rights under any subsection of Section 2511(a). ***See In re K.M.W.***, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*). However, "incarceration will certainly impact a parent's capability of performing parental duties, and may render a parent incapable of performing parental duties under subsection (a)(2)." ***Id.***

(citation omitted and emphasis omitted). "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind that the child's need for consistent parental care and stability cannot be put aside or put on hold." *Id.* (citation omitted and formatting altered). "[A] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted); *see also Z.P.*, 994 A.2d at 1119 (the same).

Here, the trial court explained:

Under [Section 2511(a)(2),] it indicates, "The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his or her physical or mental well-being. And the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent."

For more than a year [prior to] today Father has not risen above moderate compliance in this case. At one point prior to that Father had been in a position where he was substantially compliant, but his compliance rating decreased prior to his incarceration because he was not actively engaging in what this court instructed him to do . . . .

Father has not given this court any indication to show that he has the ability to parent [C]hild.

Spending a hundred hours with your child in more than two years is not sufficient to show you have the ability to parent [C]hild.

I do understand that this is his first child, but he has not demonstrated the ability to be a parent to [C]hild. His ability to have successful visitation with [C]hild does not show that he can parent [C]hild. The fact that [C]hild may enjoy seeing him just means she may be having a good time with someone who[m] she recognizes. It doesn't show a parent/child type of relationship. I

don't believe that any additional time would change the situation in this instance.

N.T., 12/12/23, at 80-82 (some formatting altered).

Following our review, we conclude that the trial court's findings are supported by competent, clear, and convincing evidence in the record, and we find no error in the trial court's legal conclusions. *See H.H.N.*, 296 A.3d at 1263. The record confirms that Father has made minimal to no progress with his single case plan objectives during the two-year period in which Child has been in DHS's care. *See* N.T., 12/12/23, at 42-43. Specifically, Father has failed to maintain adequate housing and failed to progress past unsupervised visitation with Child. *See id.* at 18-19, 33-40, 42-43, 48-53, 60-61, 64. Additionally, as of the time of the termination hearing, Father had been incarcerated for at least six months and was awaiting trial for murder. *See id.* at 11-12, 25. Father has not had contact with Child since his incarceration in May of 2023. *See id.* at 13, 36-37, 68.

Therefore, on this record, we conclude that DHS has established by clear and convincing evidence that Father has a repeated and continued incapacity; Father's incapacity has caused Child to be without essential parental care, control or subsistence; and the cause of Father's incapacity cannot be remedied. *See C.M.K.*, 203 A.3d at 262; *see also K.M.W.*, 238 A.3d at 474 (explaining that a parent's incarceration can be considered when determining whether a parent has the capability to perform parental duties); *Z.P.*, 994 A.2d at 1117 (stating that Section 2511(a)(2) emphasizes a "child's present

and future need for essential parental care, control or subsistence necessary for his [or her] physical or mental well-being" (citation omitted)). For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(2). Accordingly, Father is not entitled to relief on this claim.

## Section 2511(b)

We next review the trial court's conclusion that involuntarily terminating Father's parental rights best serves Child's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b).

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). We have explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the

> importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *T.S.M.*, 71 A.3d at 267). In *K.T.*, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the *K.T.* Court emphasized that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including

- 20 -

intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 296 A.3d at 1113 (footnote omitted and formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

> Here, the trial court explained:
>
> I also find that under [Section 2511(b),] [DHS] has met its burden by clear and convincing evidence. [C]hild will suffer no irreparable harm if Father's rights were terminated as there's not a parent child bond. While [C]hild may recognize Father and at this point it's unclear whether [C]hild would as [C]hild has not seen her Father since the end of March.
>
> But there's nothing to say that [C]hild looks to [Father] as her father. The fact that he's been a visitation resource for the most part in a supervise[ed] setting does not establish a parent/child relationship. And I find that [DHS] has met its burden under [Section 2511(b)] for these reasons.

N.T., 12/12/23, at 85 (some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. ***See K.T.***, 296 A.3d at 1113; ***T.S.M.***, 71 A.3d at 267. Mr. McNichol testified that Child looks to Foster Mother for emotional support and to provide for her physical needs. ***See*** N.T., 12/12/23, at 43-46. Child has a parental bond with Foster Mother, who is willing to adopt Child. ***See id.*** at 45-46. Mr. McNichol

further stated that it is very important that Child have a stable parental figure, and that termination of Father's parental rights is in Child's best interest, so that Foster Mother could adopt Child.  ***See id.***  For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(b).  Therefore, Father is not entitled to relief on this claim.

**Goal Change**

Father also challenges the trial court's order changing Child's permanency goal from reunification to adoption.

This Court has explained that a challenge to a goal change order on appeal is moot when this Court affirms the trial court's termination decree because "'[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.'"  ***In re D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) (quoting ***In re D.A.***, 801 A.2d 614, 616 (Pa. Super. 2002)).  Even if this issue were not moot, we would conclude that the trial court did not abuse its discretion in changing Child's permanency goal from reunification to adoption.

We review decisions changing a permanency goal for an abuse of discretion.  ***In re R.M.G.***, 997 A.2d 339, 345 (Pa. Super. 2010).  We have explained:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of

progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

The evidence described above supports the trial court's decision to change Child's permanency goal from reunification to adoption. Father has made minimal progress towards alleviating the circumstances which necessitated Child's original placement with DHS in 2021. Therefore, were we to reach this issue, we would not find that the trial court abused its discretion in changing Child's permanency goal from reunification to adoption.

For the reasons set forth above, we discern no abuse of discretion or error of law in the trial court's involuntary termination of Father's parental rights to Child. Additionally, we have conducted an independent review of the record and conclude that Father's appeal is frivolous and that Counsel has not overlooked any additional, non-frivolous issues.

For these reasons, we grant Counsel's application to withdraw, affirm the decree terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), and dismiss as moot Father's appeal from the order changing Child's permanency goal to adoption.

Decree affirmed. Appeal from the order changing the permanency goal is dismissed as moot. Counsel's application to withdraw is granted. Jurisdiction relinquished.

President Judge Lazarus joins the memorandum.

Judge Murray concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/22/2024